1 Kan. App. 2d 404 (1977)
573 P.2d 614
HENRY SCRIVNER, STANLEY BENSON, PHYLLIS McKENNA, QUINCY KELLER, EUGENE WATSON, LOUIS MITCHELL, et al., Appellants,
v.
TWIN AMERICAS AGRICULTURAL and INDUSTRIAL DEVELOPERS, INC., A Corporation, Appellee.
No. 48,228
Court of Appeals of Kansas.
Opinion filed June 24, 1977.
Petition for review denied September 8, 1977.
Donald R. Newkirk and Gerrit H. Wormhoudt, of Fleeson, Gooing, Coulson and Kitch, of Wichita, for the appellants.
Charles S. Fisher, Jr., of Topeka, for the appellee.
Before ABBOTT, P.J., FOTH and SPENCER, JJ.
FOTH, J.:
This was an action against a Panamanian corporation *405 by some 170 Kansas shareholders of the corporation, seeking primarily a court supervised election of directors and to enjoin a proposed stock issue. The district court of Kingman county sustained the defendant corporation's motion to dismiss and the plaintiff stockholders have appealed.
The judgment of dismissal was based, among other grounds, on a finding that the court lacked jurisdiction over the person of the defendant. If this was correct, and we find that it was, then dismissal was proper and all other findings of the trial court were unnecessary and constituted mere obiter dicta. Accordingly we shall confine our analysis to the question of personal jurisdiction.
The defendant Twin Americas Agricultural and Industrial Developers, Inc., was incorporated in Panama in 1967 as a subsidiary of Cattlemen's Foundation Corporation, Inc., a Kansas corporation. Cattlemen's had been formed in 1964 as essentially an insurance holding company, with its stock sold only to Kansas residents. Twin Americas, the subsidiary, is also a holding company, owning subsidiaries which directly and indirectly operate ranching, construction, motel and other businesses in Brazil. Cattlemen's and Twin Americas had interlocking boards of directors.
Between 1969 and 1972 a series of corporate financial maneuvers took place which resulted in the elimination from the scene of the parent Cattlemen's. First, there was a public offering of Twin Americas stock aimed at raising over six million dollars in new capital. The offering was only partially successful, but some of the plaintiffs acquired their stock through subscribing to it. Second, Cattlemen's sold for cash its insurance company subsidiary, the ownership of which had been its original primary purpose. It also closed down its broker-dealer subsidiary which had handled the Twin Americas offering. Third, Cattlemen's paid into Twin Americas all its assets, being primarily the proceeds from the sale of the insurance company but also including Twin Americas stock, in return for more Twin Americas stock. Finally, on February 1, 1972, Cattlemen's dissolved and distributed to its stockholders all its then assets, namely, stock in Twin Americas.
The result was that all those persons who had originally purchased stock in a Kansas insurance holding company (Cattlemen's) found themselves owning nothing but stock in a Panamanian holding company (Twin Americas) operating in Brazil. *406 A number of the plaintiffs (perhaps most) acquired their stock in the defendant through the exchange route.
It is important to note that plaintiffs' petition is wholly unrelated to the corporate restructuring which was completed in 1972. The equitable relief now sought is based solely on events which occurred and were threatened in 1975.
This lawsuit was precipitated by a letter to shareholders dated September 19, 1975, from James D. Ratliff, president and chairman of the board of Twin Americas. In it he announced the resignation of four of the company's five directors, including three who resided in Kansas. They had been replaced by two company employees, residents of Brazil, and the number of directors reduced from five to three by amendment of the by-laws. The new board proposed to issue 1,500,000 additional shares of the company (which would dilute the present stockholders' ownership from 100% to considerably less than 50%) and to sell at least part of its land holdings in Brazil. The letter also reported that the company was unable to meet its current obligations, including past-due salaries of its employees.
The petition, filed September 30, 1975, alleged the foregoing and incorporated the letter. Named as defendants were the corporation and several individuals, including the three members of the board. The petition also alleged, among other things, that the new composition of the board was in violation of the by-laws and of plaintiffs' rights as stockholders, and that the proposed stock issue and sale of assets were intended to "ruin the corporation," to confer control of the corporation on the individual defendants, and to destroy plaintiffs' rights as stockholders.
The relief prayed for was that the proposed stock issue be declared void; that the 1975 selection of new directors be declared void and they be temporarily and permanently enjoined from managing the affairs of the corporation; and that the corporation be enjoined from disposing of any of its assets until a stockholders meeting could be called and held and new directors elected. Plaintiffs also asked that their attorney be appointed receiver to manage the corporation's affairs until a stockholders meeting could be held.
The same day the trial court entered an ex parte order granting all the temporary relief prayed for, fixing November 1, 1975, as the date for a stockholders meeting, and fixing October 29, 1975, *407 as the date on which the individual defendants should show cause why they should not be permanently enjoined from further participation in the affairs of the corporation.
On October 30, 1975, the defendant Twin Americas filed a motion to dismiss under K.S.A. 60-212(b), based on the first six statutory grounds (i.e., all but failure to join a necessary party). Attached were a brief in support and voluminous corporate records and other documents. The motion was argued and sustained on November 3, 1975, and this appeal followed.
As previously stated, the threshold question facing the trial court (and now this court) was one of personal jurisdiction. In this case that question turns on the manner in which plaintiffs elected to serve process.
As to the individual defendants service was by mail. Plaintiffs do not contend that such service was good, or that the individuals named ever became parties to this lawsuit. We are therefore concerned only with jurisdiction over the corporate defendant Twin Americas.
Twin Americas was served by delivery of the summons and petition to the secretary of state by the sheriff of Shawnee county. The petition requested that service be effected in this mode based on the allegation, "[t]hat under and by virtue of K.S.A. 17-6702 and K.S.A. 17-6703(e), said defendant, Twin Americas Agricultural and Industrial Developers, Inc., has irrevocably appointed the Secretary of State of the State of Kansas as its agent to accept service of process in any suit or other process arising out of the activities of said corporation." The first statute referred to deals with mergers of domestic with foreign corporations. Subsection (d) provides that a foreign corporation surviving such a merger shall designate the secretary of state its agent for service of process in two types of cases: suits on obligations of previously existing Kansas corporations which have been merged into the foreign corporation, and suits against the foreign corporation arising out of the merger itself. The present suit is of neither type. The second statute pleaded, 17-6703(e), merely recognizes the right of a Kansas corporation to merge with a parent or subsidiary domiciled outside the United States if permitted by the laws of the country of the foreign corporation's domicile. Neither of the statutes pleaded authorizes service on the secretary of state under the circumstances existing here, and at the hearing below plaintiffs abandoned their reliance on these "merger" statutes.
*408 Plaintiffs also specifically disclaimed any reliance on the "long-arm" statute, K.S.A. 60-308. It is not contended that the petition alleges a cause of action "arising from" the "transaction of any business within this state" by Twin Americas. (K.S.A. 60-308[b] [1].)
What they are left with are the statutes requiring foreign corporations wishing to do business in this state to register with the secretary of state and receive a certificate of authority. K.S.A. (now 1976 Supp.) 17-7301 requires the filing of an application for such a certificate and requires the applicant to consent to service upon the secretary of state in any action against it. Twin Americas never applied for or received a certificate of authority to do business in Kansas. However, K.S.A. 17-7307(c) provides:
"Any person having a cause of action against any foreign corporation, whether or not such corporation is qualified to do business in this state, which cause of action arose in Kansas out of such corporation doing business in Kansas, or arose while such corporation was doing business in Kansas, may file suit against the corporation in the proper court of a county in which there is proper venue. Service of process in any action shall be made in the manner prescribed by K.S.A. 1972 Supp. 60-304." (Emphasis added.)
K.S.A. 60-304(f) would authorize service on the secretary of state, as was done here. However, under 17-7307(c), quoted above, the cause of action must have arisen either "out of such corporation doing business in Kansas," or "while such corporation was doing business in Kansas." As noted in our discussion of the long-arm statute, there is no claim that the present cause of action arose "out of" any business done by Twin Americas in Kansas. The primary acts complained of  the selection of new directors and the proposal to sell assets and issue new stock  took place at directors meetings held in Nassau, in the Bahama Islands, on July 19, 1975, and at Brasilia, Brazil, on July 25, 1975.
The remaining question is whether it arose "while" Twin Americas was "doing business" in Kansas. The phrase "doing business in this state," as used in the foreign corporation registration act, is defined in K.S.A. 17-7303, which provides in pertinent part:
"Every foreign corporation that has an office or place of business within this state, or a distributing point herein, or that delivers its wares or products to resident agents in this state for sale, delivery or distribution, shall be held to be doing business in this state within the meaning of this act...."
*409 Twin Americas, as a holding company, never had a place of business or distributing point in this state and never delivered any wares or products. Plaintiffs therefore rely on a contention that when the events complained of in the petition occurred, in the late summer of 1975, Twin Americas was maintaining an "office" in Kansas. If so, then the cause of action arose "while" it was "doing business" here and the service on the secretary of state was good. If not, then the service obtained was ineffectual and the court never acquired jurisdiction over the defendant. The hearing below was largely devoted to the issue of whether Twin Americas had an "office" in Kansas.
The allegations of the petition on this subject were as follows:
"That at all times herein mentioned, the defendant Twin Americas Agricultural and Industrial Developers, Inc., was and is a corporation organized and existing under the laws of the Country of Panama, but has since its inception maintained an office within the State of Kansas, and has during the course of its existence continued to do business in the State of Kansas by naming a transfer agent and by maintaining a corporate office at 1400 Topeka Boulevard, Topeka, Kansas 66601."
The Topeka address is that of Twin Americas' attorney, Charles S. Fisher, Jr., and of its transfer agent, Robert D. Ochs.
The petition had annexed to it the original by-laws of the corporation, presumably adopted when it was incorporated in 1967. They authorized the maintenance of offices anywhere in the world in addition to the registered office in Panama. The article dealing with stock called for a stock register and transfer book to be kept by the company's transfer agent, if one was appointed, "or in the absence of such transfer agent at the principle [sic] office of the corporation in Topeka, Kansas."
From the documents attached to its motion it appears that in its earlier years Twin Americas did maintain an office in Topeka. A prospectus dated April 30, 1970, lists that city as the site of its "United States Office" and points out that by contract an office is to be furnished and operated by its then parent corporation, Cattlemen's. The address given is 605 Quincy Street, Topeka, Kansas.
Annual stockholders meetings of Twin Americas were held at a Topeka hotel in December of 1972 and of 1973. Notices of those meetings indicated a Topeka office, although no address was given. The annual report for the fiscal year ending June 30, 1973, showed an office in the First National Bank Building in Topeka.
In April, 1974 (according to minutes submitted with the *410 motion), at a directors meeting held in Brasilia, Brazil, it was resolved to close the company offices in Topeka as an economy measure. It was directed "that such action be accomplished as soon as management finds it conveniently possible." Just when this was done does not appear from anything in the record. However, the notice of the 1974 annual meeting of stockholders, dated October 8, 1974, gave a Panama return address where the 1972 and 1973 notices had indicated Topeka. The meeting itself was to be held in the same Topeka hotel as the previous meetings.
In their brief plaintiffs argue in effect that the failure to show just when the Topeka office was closed leads to an inference that it continued to be open until suit was filed. This argument was not made below, as witness the following exchange:
"THE COURT [addressing plaintiffs' counsel]: Do you claim Twin Americas had anything else here in the way of an office other than a transfer agent at the time the suit was filed?
"MR. WYLDER [plaintiffs' counsel]: Counsel tells me they have bank accounts but I think the Court is addressing this to offices.
"THE COURT: I'm thinking about this statute. Every foreign corporation has an office or place of business.
"MR. WYLDER: It says office or place of business, it doesn't say both. There is an `or' rather than `and.' No, the only office attached to our affidavit, we point out in 1973 on their annual report, they said they have an office here in Kansas but that is not when the case was commenced, in 1973.

"THE COURT: That's right.
"MR. WYLDER: It was commenced more recently. And so the only office we can successfully contend is where the transfer agent is, which is at Topeka, Kansas.

"MR. FISHER [defendant's counsel]: May it please the Court, I think it has been conceded, but if it hasn't, I'd call your Honor's attention to the exhibits attached to our motion showing that the old Topeka office as such that was maintained was closed about 18 months before this lawsuit was filed.

"THE COURT: According to the minutes, that's right.
"MR. FISHER: It was. ..." (Emphasis added.)
There was no response by plaintiffs' counsel to these statements by defense counsel and the court  no indication of disagreement, no demand for further proof, no request for time to put on evidence. Later at the hearing, when the issue of whether the petition stated a claim was argued, plaintiffs urged the existence of unresolved issues of material fact. However, as to the existence of an office, we think a fair reading of the record shows a concession by plaintiffs that by the time the cause of action arose the regular company office had been long closed. The only "office" being maintained in Kansas was that of the company's *411 transfer agent, and it was on that office that plaintiffs necessarily relied.
It must be borne in mind that "[t]he party invoking the jurisdiction of a particular forum has the burden of proving existence of that jurisdiction." (White v. Goldthwaite, 204 Kan. 83, 460 P.2d 578, Syl. 4. See also, Hanson v. Murphy, 208 Kan. 297, 491 P.2d 551; Product Promotions, Inc. v. Cousteau, 495 F.2d 483 [5th Cir.1974].) If plaintiffs intended to rely on some office other than that of the transfer agent it was incumbent on them to establish its existence. Instead they conceded its nonexistence, and do not even now suggest that there is evidence to establish its continuation.
Plaintiffs do not cite and we are unable to find any authority saying that the mere presence of a transfer agent in a state constitutes such a doing of business as to require a foreign corporation to register and qualify. The nearest case we find in Kansas is Lumber Co. v. State Charter Board, 107 Kan. 161, 190 Pac. 601. There the charter board had refused an application of a foreign unincorporated trust company to sell stock in Kansas because it could not qualify as a foreign corporation. The court observed:
"The permission sought, however, was not admission into the state for the purpose of doing business, and was no more than an opportunity to sell shares of stock with a view of raising money on which to do business. The general holding of the courts is that the doing of business is the exercise of some of the functions and the carrying on of the ordinary business for which the company is organized. (3 Words & Phrases, p. 2155; 6 Thompson's Commentaries on the Law of Corporations, § 7936; Barse Live Stock Co. v. Range V.C. Co., 16 Utah, 59). Single and isolated transactions do not ordinarily constitute the doing of business (Osborne v. Shilling, 74 Kan. 675, 88 Pac. 258) and neither can the sale of shares or the ownership of stock of a nonresident company be regarded as within that term. (Payson v. Withers, Fed. Cas. No. 10,864, 5 Biss. 269; United States v. American Bell Telephone Co., 29 Fed. 17.)" (p. 162.)
In two federal cases we find that the tortious conduct of a transfer agent, done at the behest of a foreign corporation, rendered the corporation amenable to process in a suit arising out of the conduct of the transfer agent. Thus, in Kanton v. United States Plastics, Inc., 248 F. Supp. 353 (D.N.J. 1965), Plastics directed its New Jersey transfer agent to refuse to transfer plaintiff's stock, and gave the agent a hold harmless agreement. The suit was for wrongful failure to transfer. The holding was:

*412 "This Court does not decide that the mere presence in this state of Registrar, without more, is sufficient to subject Plastics to personal jurisdiction. But it does hold that Plastics did have such contacts with New Jersey in relation to activities giving rise to this lawsuit as to make it amenable to a judgment in personam, and that the maintenance of this action in this District does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Hoagland v. Springer, 75 N.J. Super. 560, 183 A.2d 678 (App. Div. 1962)." (p. 359. Emphasis added.)
The same issue arose in Gasarch v. Ormand Industries, Inc., 346 F. Supp. 550 (S.D.N.Y. 1972). Ormand was a Delaware corporation; its transfer agent, Morgan Guaranty Company, resided in New York. Relying on Kanton, supra, the court found jurisdiction over Ormand stating that the agent's tortious act in refusing the transfer could be imputed to the principal and amounted to a tort committed in New York by Ormand.
Here, of course, there is no claim that Twin Americas' transfer agent committed any act forming part of the cause of action. His mere presence is all plaintiffs can rely on.
Appellants do cite and rely on a New York trial court decision, Tel-A-Sign v. Weesner, 36 Misc.2d 960, 234 N.Y.S.2d 581 (1962), where service on the president of a nonqualified foreign holding corporation was upheld on the grounds that the corporation was doing business in New York, partly because it had a transfer agent in New York. The evidence there was that the corporation's secretary maintained an office in New York, and that the corporation's ledger, cash journal, general journal and correspondence files as well as its stock and stock transfer books, its corporate seal, its minute books, its stock ledger cards, its checkbooks, check stubs, banking records, and its cancelled checks were kept in New York, some in the secretary's office and some in the offices of a subsidiary in the same building. In addition, the company's correspondence was all typed in the New York office, originally for remailing from the company's Florida office but for some six or eight months directly from the New York office. As may be seen, the transfer books were but a small part of the corporate paraphernalia kept in the New York office. Although the New York judge did put some emphasis on the transfer books and their role in the activities of a holding company, their presence alone would in our mind have been wholly inadequate to amount to "doing business."
The description of the corporate office in Tel-A-Sign might *413 have fit Twin Americas' Topeka office until 1974. Had such an office continued to exist when this suit was filed we would have no difficulty in saying Twin Americas was "doing business" under 17-7303. It is conceded that it did not exist, however, and a transfer agent alone is quite a different thing.
The function of a transfer agent is simply to keep track of the corporation's own stockholders, recording transfers of shares and keeping current the list of owners for the company's own use. Such an agent has no business dealings whatsoever with third parties, and transacts no business of the corporation. At the time of suit the transfer agent was a Topeka attorney, and before that it had been a Topeka bank and trust company. Both were independent contractors performing their functions in their own offices, not an office of the company. As we see it, retaining a Kansas resident to act as transfer agent is much like retaining a Kansas lawyer to act as legal counsel, or a Kansas accountant to act as independent auditor. No one would suggest, we suppose, that a foreign corporation must qualify to do business in this state before retaining a Kansas lawyer or accountant, or that the lawyer's or accountant's office would become that of the corporation.
An argument is made that Twin Americas' character as a holding company makes the role of its transfer agent more significant, because a holding company's business is the buying, holding and selling of corporate stock. The difficulty there is that the company's transfer agent, as such, has nothing to do with transactions in the stock of other corporations but only with transfers of the stock of the parent holding company. (To the extent that he may keep stock records for a subsidiary he is its transfer agent, not the parent's; there is nothing in this record to show that Twin Americas' transfer agent fulfilled any such double role.)
The parties discuss at some length the doctrine enunciated in Internat. Shoe Co. v. Washington, 326 U.S. 310, 90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057 (1945), and subsequent cases, dealing with the "minimum contacts" a foreign corporation must have with a state before in personam jurisdiction may be exercised over it consistent with due process of law. The cases and doctrine are discussed at some length in Tilley v. Keller Truck & Implement Corp., 200 Kan. 641, 644-5, 438 P.2d 128. The "minimum contacts" doctrine, however, deals with constitutional limitations on a state's efforts to assert jurisdiction. Before reaching that *414 question in this case it must first be determined whether this state's statutes purport to give its courts jurisdiction under the circumstances present here.
In this connection it bears repeating that the present cause of action did not arise out of any of Twin Americas' activities in Kansas. Hence the concepts of "minimum contacts" and "traditional notions of fair play and substantial justice"  integral parts of the long-arm statute, which looks to a cause of action "arising from" doing business in Kansas  are simply not applicable. Jurisdiction in this case must be asserted on the basis that, although the acts complained of took place elsewhere, the defendant was "present" in this state so as to be amenable to service of process on any cause of action arising "while" it was here. (K.S.A. 17-7307[c].) As noted in Tilley, supra:
"Prior to the year 1945 the traditional approach to accessibility of a defendant to in personam jurisdiction was based upon `presence or domicile' in the forum state, (Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565; Hess v. Pawloski, 274 U.S. 352, 71 L.Ed. 1091, 47 S.Ct. 632; Milliken v. Meyer, 311 U.S. 457, 85 L.Ed. 278, 61 S.Ct. 339, 132 A.L.R. 1357) or upon `implied consent' from doing business in the forum state. (Lafayette Ins. Co. v. French, et al., 59 U.S. [18 Howard] 404, 15 L.Ed. 451; People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 62 L.Ed. 587, 38 S.Ct. 233; International Harvester Co. v. Kentucky, 234 U.S. 579, 58 L.Ed. 1479, 34 S.Ct. 944.)
"The more recent approach to accessibility grows out of five decisions of the United States Supreme Court in which that court defined certain concepts of due process in several fact situations to determine if personal service outside a forum state upon a `non-domiciliary' met the substantive due process requirement of the Fourteenth Amendment.
"The term `non-domiciliary' will be used to designate a person or corporation not accessible to in personam jurisdiction on the basis of presence, domicile, residence or doing business as understood prior to 1945." (200 Kan. at 644.)
Our long-arm statute, the Kansas post-1945 response to Internat. Shoe, is a method for reaching what the court called a "non-domiciliary" corporation. Here plaintiffs had to show that Twin Americas was a domiciliary corporation under pre-1945 concepts of "presence ... or doing business." Those are the concepts continued in our statutes relating to foreign corporations which are required to register and qualify. See, Land Manufacturing, Inc. v. Highland Park State Bank, 205 Kan. 526, 531, 470 P.2d 782, where the distinction is again made and discussed.
After Twin Americas closed its corporate office here it no longer *415 met the statutory definition of doing business in this state. Although that would seem to be enough to show that it could not thereafter be served here on a new cause of action arising elsewhere, plaintiffs also urge other conduct as justifying the assumption of Kansas jurisdiction.
First, they point out that directors meetings were held here. It is the general rule that the holding of such meetings does not by itself constitute the doing of business. (See, Benson v. Brattleboro Retreat, 103 N.H. 28, 164 A.2d 560, 84 A.L.R.2d 409 [1960], and cases in the accompanying annotation and Later Case Service.) Our statute does not purport to make every foreign corporation whose directors meet in a Kansas hotel room qualify to do business here with all the periodic filings, fees and expense that would entail. The same is true of stockholders meetings and the maintenance of bank accounts. Such activities meet neither the statutory definition nor traditional concepts of doing business. Further, neither stockholders nor directors meetings had been held in Kansas for over a year prior to the actions complained of. Hence even if the meetings did constitute doing business, the cause of action did not arise "while" the company was doing business. (There may have been a bank account still open in Kansas, but we deem that fact of no significance in determining when the company ceased doing business.)
In summary, when this cause of action arose in the Bahamas and Brazil, Twin Americas was not doing business in Kansas, was not required to be registered here, and could not be sued here on such a cause of action.
The result is that the trial court correctly found it had no jurisdiction over the person of the defendant, and correctly dismissed the action. That being so, it was unnecessary to rule on the questions of subject matter jurisdiction and the sufficiency of the petition to state a claim on which relief could be granted. As to those questions we express no opinion, and those portions of the judgment which purport to rule on those and other subsidiary questions will be vacated.
The judgment is modified by striking all grounds for dismissal except lack of jurisdiction over the person of the defendants, and as so modified is affirmed.